IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 3, 2018

FILED
02/08/2019
Clerk of the
Appellate Courts

# IN RE SERENITY W.

**Appeal from the Juvenile Court for Cocke County**
**No. TPR-05451     Steven Lane Wolfenbarger, Judge**

———————————————————

**No. E2018-00460-COA-R3-PT**

———————————————————

A mother appeals the termination of her parental rights to her child. After the mother tested positive for drugs at a court hearing, the trial court awarded temporary legal and physical custody of the child to the Tennessee Department of Children's Services. Over two years later, the juvenile court found by clear and convincing evidence three statutory grounds for termination: abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, and failure to manifest an ability and willingness to assume custody or financial responsibility for the child. The court also found by clear and convincing evidence that termination of the mother's parental rights was in the child's best interest. We conclude that the evidence was less than clear and convincing as to two of the statutory grounds but the record contains clear and convincing evidence to support one ground for termination. But because we also conclude that the evidence was less than clear and convincing that termination was in the child's best interest, we reverse the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., joined. CHARLES D. SUSANO, JR., J., filed a separate opinion concurring in part and dissenting in part.

Ryan T. Logue (on appeal), Dandridge, Tennessee, for the appellant, Brittany C.

Herbert H. Slatery III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I.

### A.

Serenity was born in December 2014 to Brittany C. ("Mother") and Christopher W. ("Father"). In May 2015, Father physically abused Serenity's half-sibling while Mother was away from home. So, at the request of the Tennessee Department of Children's Services ("DCS"), the Juvenile Court of Cocke County, Tennessee, issued a restraining order prohibiting any contact between Father and the children. Although Mother tested positive for oxycodone, suboxone, and marijuana, DCS did not seek to remove the children from Mother's custody at that time.

After the court issued the no-contact order, Mother moved with Serenity and her half-sibling to her mother's home. But in June she violated the no-contact order by allowing Father into the home. And at a subsequent hearing on August 27, 2015, Mother again tested positive for oxycodone. As a result, the juvenile court issued a bench order awarding DCS temporary legal and physical custody of Serenity and her half-sibling.

On September 28, 2015, DCS created a permanency plan for Serenity with twin goals of return to parent or exit custody with relatives. *See* Tenn. Code Ann. § 37-2-403 (2014). Under the plan, Mother needed to complete a list of responsibilities designed to enable her to provide a safe home for Serenity. In addition to drug addiction, Mother reported ongoing mental and emotional issues from past abuse. The plan required Mother to complete both an alcohol and drug assessment and a mental health assessment and to follow the resulting recommendations. The plan also required her to sign releases so that DCS could monitor her progress and to submit to random drug screens and pill counts. And Mother needed to document completion of parenting and domestic violence classes. She was granted supervised visitation and was expected to demonstrate appropriate parenting skills at visitations. Mother also needed to maintain a legal source of income, provide documentation of both housing and income, and comply with all court orders. Over the succeeding months, the plan was revised twice, but Mother's responsibilities remained largely the same.

Within a couple of months, Mother had completed both parenting and domestic violence classes and provided the appropriate documentation. And she submitted to the two required assessments in early January 2016. Based on information that Mother provided during her assessments, the provider recommended that she complete intensive outpatient alcohol and drug treatment and individual mental health therapy. The provider also indicated that Mother would benefit from medication management for any medication she was prescribed. But Mother did not follow the recommendations. And

2

after a fight with her stepfather, she was asked to leave her mother's home. She also lost her job. For most of 2016, Mother remained homeless and unemployed.

At the adjudicatory hearing on March 11, 2016, the court found clear and convincing evidence that Serenity was dependent and neglected. Mother did not appear at the hearing. And on April 25, 2016, she tested positive for amphetamine and methamphetamine. After the positive drug screen, she enrolled in a recovery program, but dropped out a few months later. At the end of October 2016, she rented a trailer home, but was evicted after a few months because "[she] let just anybody in [her] house and the law was there constantly." After that, she lived either with relatives or on the streets.

In early November 2016, the court ordered her to submit to a hair follicle test, but Mother failed to comply by the court imposed deadline. At the review hearing on December 9, the court suspended her visitation until she appeared for a drug screen. Mother did not appear until February 2017. She had obtained the requested hair follicle test, but it was positive for methamphetamine. Even so, the court allowed her to resume supervised visitation because she passed the court-administered drug screen.

On March 31, 2017, DCS filed a petition to terminate Mother's parental rights.[1] The petition alleged four grounds for termination: abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest the ability and willingness to parent.

Even after the termination petition was filed, Mother continued to use illegal drugs. After she missed a scheduled visit with Serenity in late April, the family service worker or FSW required Mother to submit to a drug screen before rescheduling the visit. Mother repeatedly failed to appear for the requested drug screen. As a result, she did not visit with Serenity again until September.

In September 2017, Mother moved in with her grandparents and finally started working on the recommendations from her assessments. She completed an inpatient rehabilitation program and began intensive outpatient alcohol and drug treatment four days per week. In November 2017, she also began to address her mental health issues. Mother suffered from anxiety and post-traumatic stress disorder from past abuse. On November 12, she began taking appropriate medication, enrolled in medication management, and began individual therapy.

---

[1] DCS also petitioned to terminate Father's parental rights. Father's rights are not at issue in this appeal.

3

In December 2017, Mother found a part-time job.[2]   And in January 2018 she obtained full-time employment at Taco Bell.

B.

At the termination hearing on February 2, 2018, the court heard testimony from the FSW, Mother, the foster mother, and Mother's grandfather.  According to the FSW, Mother's compliance with the permanency plan was spotty.  He acknowledged that she completed the required assessments and classes.  But she never provided documentation that she followed the recommendations from the assessments, and she failed to maintain stable employment or housing.  Although she passed most of her drug screens, she had some notable fails.

Serenity had been in the same foster home for over two years.  At three, she was thriving in her current environment.  She had formed a strong bond with her foster parents, who were also her great-grandparents.[3]  The foster parents desired to adopt her.

According to the FSW, Mother attended approximately sixty percent of her scheduled visits.   Most of her interactions with Serenity were appropriate.  Based on the FSW's observations, Mother did not appear to have a close relationship with Serenity. Serenity never mentioned Mother to the foster parents and separated easily when the visits ended.

For her part, Mother acknowledged her past mistakes.  She admitted to using methamphetamine as recently as September 2017.  But she reported that she had been clean and sober since November 12, 2017, a record for her.  All of her previous attempts to overcome her drug addiction had ended after a month.  She was also employed, living in a stable home with her grandparents, and actively participating in mental health therapy and intensive outpatient drug treatment.  Her outpatient treatment would be finished at the end of February.

Mother conceded that it had taken her three years to get clean, mainly because she had been in denial.  She credited her grandfather for her new stability.  He drove her to all her appointments and provided needed accountability.  According to Mother, "[t]his is the biggest opportunity that I've had in a long time and I'm taking full advantage of it."

The juvenile court did not find that DCS had proven persistence of conditions by clear and convincing evidence.  But the court found clear and convincing evidence for the

---

[2] Prior to December 2017, Mother had not had stable employment since the end of January 2016. In early 2017, she worked for approximately three months for Koch Foods.

[3] Mother has two sets of grandparents.  She lived with one set while Serenity was placed in the home of the other set.

4

three remaining grounds alleged in the petition and that termination of Mother's parental rights was in the child's best interest. So on February 12, 2018, the juvenile court terminated Mother's parental rights.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re*

*Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## III.

Mother appeals from the termination of her parental rights arguing that it was not in Serenity's best interest to terminate her parental rights. She presents no argument challenging the grounds for termination found by the trial court. Nonetheless, we must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn.), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

### A. GROUNDS FOR TERMINATING PARENTAL RIGHTS

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment").

A child has been abandoned under the second statutory definition if the child has been removed from the home of a parent as a result of a petition filed in juvenile court, which ultimately results in a finding that the child was dependent and neglected, and

> for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

A suitable home means more than an adequate living space. *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014). Children also need appropriate care and attention. *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). Thus, a parent's conduct can render an adequate living space unsuitable. *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011). A suitable home is free from drugs and domestic

6

violence. *In re Hannah H.*, 2014 WL 2587397, at *9. And the parent's efforts to comply with the responsibilities in the permanency plan are directly relevant to the ability to provide a suitable home. *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *6 (Tenn. Ct. App. Feb. 1, 2017).

Here, we are concerned with the evidence of reasonable efforts during the time period from August 28, 2015, the day following removal, to December 28, 2015. DCS has the burden of proving that its efforts were reasonable under the circumstances. *In re Hannah H.*, 2014 WL 2587397, at *9. The proof on this point is sparse. DCS created a permanency plan and referred Mother to the appropriate providers after verifying that her insurance would cover the necessary services. The agency also obtained separate funding for Mother's hair follicle test. The FSW also administered drug screens and monitored Mother's progress in completing her responsibilities.

To meet the requirement of reasonable efforts, DCS must do more than simply provide a parent with a list of service providers. *In re Isobel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8 (Tenn. Ct. App. Nov. 8, 2012). Rather, the agency must use its "superior insight and training to assist parents with the problems . . . identified in the permanency plan, whether the parents ask for assistance or not." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d at 555. But DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii).

During the four-month period following removal, Mother completed parenting and domestic violence classes but made no attempt to address her drug addiction or mental health issues. She delayed submitting to the required assessments until after the four-month period. And even after the assessments, she failed to seek the recommended treatment. Although DCS's efforts were minimal, in light of Mother's lack of effort during this same period, we conclude that DCS's efforts to assist Mother were reasonable.

Beyond reasonable efforts by DCS and a lack of reasonable efforts by Mother, DCS must also show Mother demonstrated a lack of concern for her child such that it appears unlikely she will be able to provide a suitable home at an early date. *See id.* By the time of trial, Mother had completed an inpatient rehabilitation program and participated in intensive outpatient drug treatment. She had been drug free for several months. She was also taking medication for her mental health issues and participating in individual therapy. The trial court did not consider these positive changes because they occurred outside the four-month period. But in evaluating this element, Mother's more recent behavior may be considered. *See In re Joshua S.*, 2011 WL 2464720, at *18.

7

Based on Mother's efforts at compliance by the time of trial, we cannot say that there was clear and convincing evidence that Mother exhibited such a lack of concern for the welfare of her child that it appeared unlikely that she would be able to provide a suitable home at an early date. *See In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193, at *11 (Tenn. Ct. App. July 13, 2017) (concluding that DCS failed to establish this element of abandonment based on Mother's positive changes by the time of trial). Because DCS failed to prove this element by clear and convincing evidence, we conclude that terminating Mother's parental rights based on the ground of abandonment was inappropriate.

2. Substantial Noncompliance with the Permanency Plan

The juvenile court also found Mother was not in substantial compliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy were "reasonable and are related to remedying the conditions that necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *Id.*

All three permanency plans required Mother to complete both an alcohol and drug assessment and a mental health assessment and to follow the resulting recommendations; to sign the appropriate releases; to submit to random drug screens and pill counts; to document completion of parenting and domestic violence classes; to visit Serenity as scheduled; and to demonstrate appropriate parenting skills during visitations. Mother also needed to maintain a legal source of income, provide documentation of housing and income, and comply with all court orders. We agree with the juvenile court that the requirements of the permanency plans were reasonable and related to remedying the conditions that necessitated foster care.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

Mother attended the required classes and completed her assessments. She also demonstrated appropriate parenting skills during her visits with Serenity. But her remaining responsibilities had not been addressed at the time the termination petition was filed. She had not followed the recommendations from her assessments or maintained stable employment or housing. We recognize that by the time of trial Mother's circumstances had changed. Improvements in compliance "should be considered in a parent's favor." *Id.* at 549. The trial court found that Mother's post-petition efforts were late. And we agree.

Certainly, parents with drug addictions can "have false starts and set backs, as well as successes and, regrettably, backsliding," and we should take that into account. *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *11 (Tenn. Ct. App. Apr. 14, 2005). But "a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). Substantial compliance requires parents to "complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis." *Id.*

We cannot overlook Mother's extended period of inaction. Despite her early progress, Mother made no real effort to address the conditions that prevented reunification for almost two years. She admitted that she was still using methamphetamine in September 2017. While her recent efforts are commendable, the evidence was clear and convincing that Mother did not substantially comply with the requirements of the permanency plan. *See In re Isabella G.*, No. M2016-02105-COA-R3-PT, 2017 WL 4407816, at *10 (Tenn. Ct. App. Oct. 3, 2017), *perm. app. denied*, (Jan. 5, 2018) (finding clear and convincing evidence of substantial noncompliance when parents waited over a year before making "any serious effort at fulfilling their responsibilities"); *In re Malaya B.*, No. E2015-01880-COA-R3-PT, 2016 WL 3083045, at *5 (Tenn. Ct. App. May 24, 2016), *perm. app. denied*, (Aug. 10, 2016) (finding clear and convincing evidence of substantial noncompliance when the mother failed to address her drug addiction and mental health issues until after the termination petition was filed).

3. Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody

Finally, the court found termination of parental rights appropriate under § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical

9

custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14).

As to the first prong, DCS must prove by clear and convincing evidence that Mother failed to manifest an ability and willingness to personally assume legal and physical custody of the child or that she failed to manifest an ability and willingness to personally assume financial responsibility for the child. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Ability focuses on the parent's lifestyle and circumstances. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). When evaluating willingness, we look for more than mere words. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) ("Although Mother testified that she was both willing and able, her actions proved otherwise."). Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child. *See In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *18 (Tenn. Ct. App. May 8, 2018) (focusing on the mother's lack of effort to remove the threat of domestic violence); *In re Maya R.*, 2018 WL 1629930, at *7 (focusing on the mother's lack of effort to fulfill her responsibilities in the parenting plan).

With respect to the second prong, DCS must establish that placing the child in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the child by the same quantum of proof. *See In re Maya R.*, 2018 WL 1629930, at *7. Previously, we have described "a risk of substantial harm" in these terms:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

We conclude that, prior to the filing of the petition, Mother did not exhibit an ability and willingness to personally assume legal and physical custody or financial responsibility for her child. When the termination petition was filed, almost two years after Serenity entered foster care, Mother had not yet addressed her drug addiction or

10

mental health issues. She also lacked stable employment and housing. Mother's lack of effort before the termination petition was filed undercuts any willingness argument. And her recent positive changes are of too short a duration to demonstrate that she is currently able to assume custody of her child. *See In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at \*7 (Tenn. Ct. App. Dec. 27, 2017) (concluding that the parent must demonstrate ability and willingness as of the date the termination petition was filed); *cf. In re Maya R.*, 2018 WL 1629930, at \*7 (examining evidence of the mother's conduct both before and after the petition was filed).

But the evidence was less than clear and convincing that placing the child in Mother's custody would pose a risk of substantial harm to the child's physical or psychological welfare. Although Mother used illegal drugs throughout much of this case, she was drug free at trial. She had completed an inpatient drug treatment program and was nearly finished with intensive outpatient treatment. She also had strong support from her grandparents, who were driving her to her appointments and ensuring she complied with all recommendations. While a relapse was a theoretical possibility, DCS failed to prove that it was a reasonable probability. So we conclude that terminating Mother's parental rights on the ground of failure to manifest an ability and willingness to assume legal and physical custody was also inappropriate.

## B. BEST INTEREST OF THE CHILD

Having determined that one statutory ground for termination was proven by clear and convincing evidence, we must determine whether termination of Mother's parental rights is in the child's best interest. Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis. In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Needless prolonged placement in foster care is never in a child's best interest. Tenn. Code Ann. § 37-2-401(a) (2014). But we cannot discount the value of the parent-child relationship. *Id.* § 36-6-401(a) (2017). So the analysis should also take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at \*6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must]

11

amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). And the second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible."). Here, the trial court found that Mother's recent positive changes were insignificant in light of the length of time Serenity had been in foster care and that it was too soon to know if her adjustment would last.

We conclude that the evidence preponderates against the trial court's findings on the first two factors. At the time of trial, Mother was employed, drug free, and living with her grandparents. DCS presented no evidence that Mother's current home was unsafe. Mother was also participating in intensive outpatient drug treatment, medication management, and individual mental health therapy. These changes, albeit late in coming, were significant.

And Mother made these changes with limited assistance from DCS. DCS merely provided her with a list of service providers, verified her insurance coverage, and then monitored her progress. We recognize that Mother's current sobriety is of short duration. She could relapse; she has done so before. And a relapse would jeopardize all of her recent progress. On the other hand, Mother has a strong support system with her grandparents, who are monitoring her progress and providing her transportation and housing. We cannot say that lasting adjustment did not reasonably appear possible.

Under the third factor, we consider Mother's track record in visiting Serenity. *See id.* § 36-1-113(i)(3). The evidence does not preponderate against the trial court's finding that Mother did not visit regularly. She had several gaps in visitation and only attended sixty percent of her scheduled visits.

The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Serenity lived with Mother for six months before she was placed in foster care. And Mother has visited Serenity throughout this case. Based on these visits, the court found that Mother and Serenity may have a meaningful relationship. While there is contrary evidence, the evidence does not preponderate against the court's finding.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *See id.* § 36-1-113(i)(5).

Although Serenity has a strong bond with her foster parents, she also has a meaningful relationship with Mother. DCS did not present any evidence that Mother would be unable to meet Serenity's needs. And Serenity should be able to continue her relationship with her great-grandparents. While any change can be disruptive to a three-year-old, the evidence does not support the trial court's finding that a change of caregivers would be detrimental.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *See id.* § 36-1-113(i)(6). The trial court found this factor favored Mother, and we agree. Mother ended her relationship with Father, and there was no evidence of brutality or abuse in her current home.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [the intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The evidence does not preponderate against the trial court's finding that Mother's current home is healthy and safe. And, at the time of trial, Mother was drug free.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). Mother has a history of drug abuse and has been diagnosed with PTSD and anxiety. But at the time of trial, she was drug free, actively participating in individual therapy, and taking appropriate medications for her diagnoses. She was excited about resuming her role as a parent. DCS presented no contrary evidence. The trial court was not convinced that Mother had overcome her past. The court expressed concern that her "ongoing substance abuse" and PTSD would hamper her ability to provide appropriate care for Serenity. While we appreciate those concerns, the evidence does not support those findings.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). The only evidence on child support was the FSW's testimony that Mother paid "some [child support] at some time."

The trial court determined that the combined weight of the statutory factors favored termination of Mother's parental rights. The court focused on Mother's past behavior and was unconvinced that her recent adjustment would last. Whether a return to the parent's home is likely in the near future is an important consideration. *In re C.B.W.*, 2006 WL 1749534, at *8. The best interest analysis necessarily involves some prediction

13

of future events. *Id.* at *6. Lacking a crystal ball, we cannot be sure that Mother's positive changes will last. But the mere possibility that Mother could relapse and resume her previous behavior "does not amount to clear and convincing evidence that termination is in the [child's] best interests." *In re Gabriella D.*, 531 S.W.3d at 686.

We conclude that the evidence is less than clear and convincing that termination of Mother's parental rights is in the child's best interest. The best interest analysis involves "a delicate balance between the substantial need to provide the child stability and the interest of the child in maintaining a relationship with his or her biological family." *In re Wesley P.*, No. W2014-02246-COA-R3-PT, 2015 WL 3430090, at *13 (Tenn. Ct. App. May 29, 2015). Serenity has been in foster care for over two years. But her foster parents are her great-grandparents. And she has a meaningful relationship with Mother. *See In re P.G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *17 (Tenn. Ct. App. Aug. 17, 2018) ("[W]hether a meaningful relationship exists is often a strong factor in determining the child's best interests."). Mother has made significant positive changes in her lifestyle and living conditions. While she may not be ready to resume her role as parent today, that is not the issue before us. *See In re C.B.W.*, 2006 WL 1749534, at *8 (explaining that the denial of a petition to terminate parental rights does not automatically return a child to the parent's custody). We simply hold that DCS failed to prove, by clear and convincing evidence, that terminating Mother's parental rights was in the child's best interest.

**IV.**

Although the evidence supporting one statutory ground for termination was clear and convincing, we conclude that DCS failed to carry its burden of proving that termination of Mother's parental rights was in the child's best interest by the same measure of proof. So we reverse the termination of parental rights.

_____
W. NEAL MCBRAYER, JUDGE